IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

**Karleen Hollis,**

      **Plaintiff,**

v.                                                                       Case No. 13-CV-1083

**Acoustic Sounds, Inc.**

      **Defendant.**

## MEMORANDUM & ORDER

Plaintiff Karleen Hollis filed this lawsuit against her former employer Acoustic Sounds, Inc. asserting claims of sexual harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and a Kansas common law whistleblower claim. This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 44). As explained below, the motion is granted in part and denied in part. It is granted on plaintiff's sexual harassment and state law whistleblower claims and is denied on plaintiff's retaliation claim.

**I.    Facts[1]**

The following facts are uncontroverted or related in the light most favorable to plaintiff as the nonmoving party. Defendant Acoustic Sounds, Inc. is a music-related business located in

---

[1] In response to defendant's statement of facts and in support of several of her own facts, plaintiff cites to her unverified first amended complaint. Because her unverified complaint does not constitute proper summary judgment evidence, the court has disregarded these alleged facts. *See Rohr v. Allstate Fin. Servs.*, 529 Fed. Appx. 936, 940 n.2 (10th Cir. 2013) (disregarding factual assertions based solely on unverified complaint).

Salina, Kansas that specializes in the sale of LPs, CDs, digital downloads and stereo equipment. Plaintiff Karleen Hollis began her employment with defendant in December 2007. In January 2010, plaintiff was promoted from the warehouse to inventory control manager. At all times relevant to this lawsuit, plaintiff was supervised by Steve Decker, whom she viewed as a "father figure" and with whom she felt comfortable talking about personal issues. Chad Kassem serves as president and CEO of defendant.

In November 2010, plaintiff began a sexual relationship with Brett Hensley, a co-worker. It is undisputed that Mr. Hensley had no supervisory authority over plaintiff. The relationship lasted until early January 2011. During their relationship, plaintiff and Mr. Hensley engaged in consensual sexual intercourse in the workplace on at least 10 occasions; engaged in consensual displays of affection in the workplace including kissing and hand-holding; and sent each other suggestive test messages, including pictures of plaintiff's breasts and vagina sent by plaintiff to Mr. Hensley. During this time, plaintiff spoke openly to Mr. Decker about her relationship with Mr. Hensley. Mr. Decker did not encourage the relationship and he advised both plaintiff and Mr. Hensley against dating "somebody within the company." He also expressed his concern to both plaintiff and Mr. Hensley that both of them had a history of relationship problems.

In early January 2011, plaintiff ended her relationship with Mr. Hensley. According to plaintiff, Mr. Hensley sexually harassed her from that time until March 2011. Plaintiff testified that Mr. Hensley sent her frequent text messages asking to resume the relationship (or asking her to meet him someplace at work for sex) and threatening to have her fired if she did not resume the relationship; came up behind her on one occasion when she was standing on a ladder and placed his hands between her legs; frequently licked his lips while looking at her or walking past

her; and accused her of giving him herpes and asking her on one occasion to look at his penis to see whether it "looked like herpes." Plaintiff also testified that she had sexual intercourse with Mr. Hensley in the workplace on two or three occasions during this time frame because Mr. Hensley threatened to have her fired if she did not have sex with him. Again, the parties do not dispute that Mr. Hensley had no authority to fire plaintiff.[2]

In March 2011, plaintiff complained to Mr. Decker about Mr. Hensley. She testified that she complained about the ladder incident and about Mr. Hensley asking her for sex on one occasion but she concedes that she did not complain to Mr. Decker about any other conduct on the part of Mr. Hensley. According to plaintiff, Mr. Decker responded that he would speak with Mr. Hensley but that she and Mr. Hensley "would basically have to learn how to work together if [they] wanted to keep employment there." It is uncontroverted that plaintiff did not complain to Mr. Decker or anyone else with defendant about Mr. Hensley's behavior at any time after March 2011.

Plaintiff testified that after she complained to Mr. Decker in March 2011, there was a significant change in Mr. Hensley's conduct toward her. According to plaintiff, Mr. Hensley on one occasion in June or July 2011 asked her whether they could resume their relationship (which she declined) but made no more sexual advances toward her and that on one occasion in October or November 2011 Mr. Hensley accused plaintiff of having sex "with an old man" when he

---

[2] Plaintiff testified that during the course of her relationship with Mr. Hensley he told her that if she tried to end the relationship then he would get her fired by telling lies about her to Mr. Decker. According to plaintiff, she told Mr. Decker about these threats (again, during her relationship with Mr. Hensley) and Mr. Decker assured her that it made no difference what Mr. Hensley said about plaintiff in terms of her continued employment. Plaintiff testified that this comforted her because she trusted Mr. Decker.

3

learned she had gone to lunch with another male coworker.  Other than isolated incidents during which Mr. Hensley "gave her the eyes" or licked his lips, plaintiff experienced no more harassment from Mr. Hensley during the course of her employment.  Plaintiff testified that Mr. Decker, every time he saw Mr. Hensley come close to plaintiff in the workplace, would remind Mr. Hensley "what I told you," which plaintiff interpreted as Mr. Decker reminding Mr. Hensley not to talk to plaintiff in the workplace.

Other than her one complaint to Mr. Decker about Mr. Hensley in March 2011, plaintiff complained to Mr. Decker about two other incidents in the workplace concerning sexual harassment.  Plaintiff testified that she also made these complaints in March 2011.  The first concerned an incident in which two co-workers allegedly invited plaintiff to participate in an orgy.  Plaintiff complained to Mr. Decker about the conversation and it is uncontroverted that Mr. Decker addressed the situation and it did not happen again.  The second concerned an incident in which plaintiff complained about inappropriate music being played in the warehouse and it is uncontroverted that Mr. Decker told the warehouse employees to change the music, to keep their music selections "clean" and that the issue was resolved to plaintiff's satisfaction.

On December 14, 2011, Mr. Decker held a meeting with plaintiff during which he intended to warn plaintiff about the quality of her work and her failure to complete a project.  Mr. Decker and plaintiff agree that their discussion became heated and it is uncontroverted that plaintiff became very belligerent during the meeting and would not permit Mr. Decker to speak despite the fact that Mr. Decker asked her at least once to permit him to do so.  Plaintiff testified that she discussed with Mr. Decker the fact that a rumor had been circulating in the workplace that a "sex tape" existed depicting her and an unidentified male having sex in a vehicle in

4

defendant's parking lot. She testified that she was upset by this rumor, that she discussed the rumor with Mr. Decker and that she did not believe that Mr. Decker did enough to stop the rumor about the sex tape. Mr. Decker testified that Mr. Hensley brought a video to him at some point, that Mr. Decker watched that video and that the video depicted only "two people getting into a van, and a little bit later, two people getting out." He testified that he assured plaintiff that there was no video "floating around" the workplace concerning plaintiff but that he did not discuss the video with employees or otherwise ask employees to stop talking about the video because, in his perception, plaintiff was the only person talking about the video in that she kept asking employees whether they had seen the video. Plaintiff also testified that she told Mr. Decker that she had heard a comment he made to Mr. Hensley about another female employee and how that employee was dressed and that she felt it was "wrong" of Mr. Decker to talk to an hourly associate about another employee in that manner.

At the conclusion of the meeting with plaintiff, Mr. Decker met with Mr. Kassem, defendant's president and CEO, to discuss the meeting with plaintiff. Mr. Kassem told Mr. Decker that "we probably ought to let her go" in light of her insubordination as well as job performance issues. In the meantime, plaintiff, immediately after her meeting with Mr. Decker, sent a lengthy email to Susan Scott, who served as defendant's bookkeeper and also had limited responsibilities in human resources. In her email, plaintiff relayed to Ms. Scott that she had had a meeting with Mr. Decker that morning and that she advised Mr. Decker that she felt like she was being "pushed out" of employment but that Mr. Decker "became very upset" and assured her that he was "not pushing [her] out." Plaintiff also advised Ms. Scott that she had raised with Mr. Decker the "sex tape" rumor. Toward the end of the e-mail, plaintiff wrote:

5

> There were several times the conversation with Steve became heated with him telling me 5 times to "shut up." I feel there is too much going on for me to handle this by myself. I do not have anybody here at Acoustic Sounds I can go to and receive help with situations at hand. I have filled [*sic*] a formal grievance with the EEOC and the Department of Labor.

Two days later, Mr. Decker terminated plaintiff's employment in a very brief meeting in which Mr. Decker simply told plaintiff that defendant "no longer needed her services." Mr. Decker testified that he had no knowledge that plaintiff was contemplating a lawsuit or grievance against defendant for any reason at the time he terminated her employment.

Ms. Scott testified that she discussed with Mr. Decker the substance of plaintiff's email on the day prior to plaintiff's termination but she did not recall forwarding the email to him. According to Ms. Scott, she "mostly" told Mr. Decker that plaintiff was "going to file a grievance." Ms. Scott testified that she explained to Mr. Decker that she believed that plaintiff was going to file a grievance about the "heated" discussion he had with plaintiff in which Mr. Decker allegedly told plaintiff to "shut up" on five occasions. Although Ms. Scott testified that she believed that plaintiff wanted to file a grievance concerning "a hostile work environment," Ms. Scott also testified that plaintiff never expressed to her that she believed she had been sexually harassed. Similarly, plaintiff testified that she never complained to Ms. Scott about sexual harassment.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II. Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed.R.Civ.P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III. Sexual Harassment Claim

In the pretrial order, plaintiff contends that she was subjected to sexual harassment in the workplace at the hands of Mr. Hensley and that defendant failed to respond adequately to her complaints of sexual harassment. To survive summary judgment on a claim of sexual harassment, plaintiff must show, among other things, that she was subjected to unwelcome harassment based on her sex and that, due to the harassment's severity or pervasiveness, the harassment altered a term, condition or privilege of her employment and created an abusive working environment. *See Kline v. Utah Anti-Discrimination and Labor Div*., 418 Fed. Appx. 774, 780-81 (10th Cir. 2011) (citing *Harsco Corp. v. Renner*, 475 F.3d 1179. 1186 (10th Cir. 2007)). In addition, because plaintiff alleges sexual harassment by a coworker as opposed to a supervisor, plaintiff must show that the employer is liable for the harassment on a negligence

7

theory—that is, that the employer know or should have known about the conduct and failed to stop it. *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012).

As an initial matter, defendant briefly argues that it is entitled to summary judgment because plaintiff was a willing and active participant in any sexual behavior occurring in the workplace such that she cannot establish the "unwelcome" element of her claim. This argument is easily rejected. While it is uncontroverted that plaintiff and Mr. Hensley participated in a consensual sexual relationship until approximately January 2011, the facts viewed in the light most favorable to plaintiff are sufficient to demonstrate that Mr. Hensley engaged in unwelcome conduct once plaintiff ended the relationship. *See Williams v. Herron*, 687 F.3d 971, 978 (8th Cir. 2012) (sexual harassment claim can arise from relationship that was once consensual but later became unwelcome); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (fact that plaintiff and alleged harasser had consensual relationship prior to alleged harassment is "by no means dispositive" of sexual harassment claim).

While defendant denies that any sexual harassment occurred, its main point on summary judgment is that it cannot be held liable for any sexual harassment because it took prompt remedial action in response to plaintiff's complaints. *See Bertsch*, 684 F.3d at 1028. As suggested earlier, an "employer's liability for allowing a sexual hostile work environment after it is reported to the employer by the employee arises only if the employer fails to take adequate remedial and preventative responses to any actually or constructively known harassment." *Id.* Plaintiff does not contend that defendant knew about any harassment in the workplace prior to March 2011, when plaintiff complained to Mr. Decker. The question of whether defendant is

liable for harassment in the workplace, then, turns only on the adequacy of defendant's response to the harassment beginning in March 2011 when plaintiff first reported it.

The "touchtone" for measuring an employer's response to sexual harassment is reasonableness. *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 675–76 (10th Cir. 1998). An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligation by taking appropriate remedial or preventative action. *Id.* at 676. The Tenth Circuit has expressly recognized that a district court may, on summary judgment, determine whether an employer's responses to claims of sexual harassment were reasonable as a matter of law. *See Bertsch,* 684 F.3d at 1028 (affirming grant of summary judgment on employer liability issue where no reasonable jury could conclude that the employer's response was not effective); *Holmes v. Utah, Dep't of Workforce Servs*., 483 F.3d 1057, 1069 (10th Cir. 2007) (citing *Scarberry v. Exxonmobil Oil Corp*., 328 F.3d 1255, 1257 (10th Cir. 2003)) (where the issue is whether an employer was negligent in allowing co-employees to sexually harass plaintiff, the court may simply examine the record, including the undisputed evidence, to determine whether the employer's responses to claims of sexual harassment were reasonable as a matter of law). After carefully considering the facts viewed in the light most favorable to plaintiff, the court concludes that plaintiff has not come forward with sufficient evidence from which a jury could conclude that defendant's response was inadequate. On the contrary, the record establishes as a matter of law that defendant's response was prompt, adequate and effective as a matter of law.

The court begins with plaintiff's evidence concerning harassment in the workplace that did not involve Mr. Hensley. She points to two isolated incidents of harassment—the playing of

inappropriate music in the warehouse and being invited by two male coworkers to participate in an orgy. It is undisputed that plaintiff complained about these incidents to Mr. Decker, that Mr. Decker took immediate action to stop the conduct, and that no similar issues occurred again. Plaintiff in no way challenges defendant's response to these incidents. As a matter of law, defendant's stoppage of the harassment by these unidentified perpetrators evidences the effectiveness of defendant's response and defendant cannot be held liable for the harassment.

With respect to the conduct involving Mr. Hensley, plaintiff does not dispute that Mr. Hensley's conduct changed significantly after she complained to Mr. Decker in March 2011. Aside from isolated lip-licking and "giving her the eyes," plaintiff identifies only two specific instances of purported misconduct by Mr. Hensley after March 2011. During the summer of 2011, Mr. Hensley asked plaintiff whether she would be willing to resume their consensual sexual relationship. Plaintiff does not contend that Mr. Hensley's question was anything other than a fairly reasonable question asked by a typical ex-boyfriend on the losing end of a breakup. She testified that she turned him down and that was the end of the discussion. She did not notify Mr. Decker or anyone else about this discussion. The only other incident that occurred was Mr. Hensley's accusation in October or November 2011 that plaintiff was having sex with "an old man" when he learned she had gone to lunch with a male coworker. Again, plaintiff did not notify Mr. Decker or anyone else about this incident which, when viewed in the context Mr. Hensley's prior consensual relationship with plaintiff, suggests that it was an emotional response of a jealous ex-boyfriend rather than unlawful harassment based on plaintiff's sex.

The record reveals, then, that plaintiff's complaint had the effect of stopping the issues about which she complained—either Mr. Hensley's unwanted advances or inappropriate

physical contact by Mr. Hensley. While defendant's response may not have stopped the natural course of events that reasonably transpire between two adults who both work together and who have been engaged in a consensual sexual relationship, the response was reasonable in the light of those circumstances. It is uncontroverted that Mr. Decker advised both plaintiff and Mr. Hensley that they were going to have to find a way to work together despite the end of their relationship; that Mr. Decker advised Mr. Hensley not to engage in conversation with plaintiff; and that he consistently reminded Mr. Hensley about that admonition each time he witnessed Mr. Hensley in close proximity to plaintiff. Plaintiff identifies no response that defendant might have taken to guarantee plaintiff a workplace that was completely sanitized of her previous relationship with Mr. Hensley. Had plaintiff reported the two incidents which occurred after March 2011, to be sure, some additional response by defendant would have been warranted, but she did not.

The last issue concerns the "sex tape" rumors allegedly circulating around the workplace and defendant's failure to put an end to those rumors. Based on plaintiff's own testimony, she did not raise the issue of the sex tape rumors with Mr. Decker until December 14, 2011—two days prior to her termination. While she may have discussed those rumors with Mr. Decker prior to that date, the record does not reflect any prior complaints about that subject. Based on the timing of plaintiff's complaint, then, defendant cannot be held liable for any conduct relating to the alleged sex tape. *See Adler*, 144 F.3d at 676 (in assessing reasonableness of response where effectiveness is not readily evidenced by a stoppage, the court must consider the timeliness of the plaintiff's complaint and whether the employer unduly delayed in its response).

In sum, plaintiff has not brought to the court's attention sufficient evidence to establish the essential element for employer liability that defendant inadequately responded to incidents of harassment of which it knew or should have known. The record evidence demonstrates that defendant's responses to plaintiff's complaints were prompt, reasonable and effective, particularly when viewed in the context of plaintiff's and Mr. Hensley's prior consensual sexual relationship. Summary judgment in favor of defendant is warranted on plaintiff's sexual harassment claim.

## IV. Retaliation Claim

Title VII makes it unlawful for an employer to retaliate against an employee because he or she has opposed any practice made an unlawful employment practice by those statutes. 42 U.S.C. § 2000e–3(a). Plaintiff asserts in the pretrial order that defendant terminated her employment in retaliation for her complaints about sexual harassment in the workplace and her assertion that she intended to file a charge with the EEOC.[3] The court assesses plaintiff's retaliation claim under the *McDonnell Douglas* framework. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). To state a prima facie case for retaliation, plaintiff "must show (1) [s]he engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3)

---

[3] In her response to defendant's motion for summary judgment, plaintiff attempts to assert retaliation claims based not only on her termination but also on defendant's failure to stop the rumors about the sex tape and failure to publicly punish Mr. Hensley. Because these claims do not appear in the pretrial order, they are waived. *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir.2 002) (claims, issues, defenses or theories of damages not included in the pretrial order are waived).

a causal connection existed between the protected activity and the materially adverse action." *Id.* (quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008)). If plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for its employment actions. *Debord v. Mercy Health Sys. of Kansas, Inc.*, ___ F.3d ___, 2013 WL 6170983 (10th Cir. Nov. 26, 2013). Plaintiff, then, must show that defendant's stated reasons are pretextual. *Id.*

In its motion for summary judgment, defendant contends that plaintiff cannot establish a causal connection for purposes of her prima facie case of retaliation because her last complaint occurred in March 2011, nearly nine months prior to her termination. The court rejects this argument. Viewed in the light most favorable to plaintiff, the evidence is sufficient to permit a reasonable jury to conclude that plaintiff engaged in protected activity just 48 hours before the termination of her employment and that defendant had knowledge of that protected activity at the time it terminated plaintiff's employment. *Shaw v. Tulsa Dynaspan Arrow Concrete*, 408 Fed. Appx. 177, 183 (10th Cir. 2011) (temporal proximity enough to show causation for purposes of establishing prima facie case where termination occurred 10 days after protected activity); *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (temporal proximity of two weeks between termination and protected activity is alone sufficient to establish causal connection for purposes of prima facie case of retaliation).

Plaintiff contends that she engaged in multiple instances of protected activity within 48 hours of her termination—she complained to Mr. Decker during the December 14, 2011 meeting about his refusal to address rumors in the workplace about the alleged "sex tape" and about his treatment of a female associate during a discussion he had with Mr. Hensley; and she notified

13

Ms. Scott on December 14, 2011 that she intended to file a grievance with the EEOC.[4]  In its reply brief, defendant does not dispute that these activities constitute protected activities for purposes of Title VII.[5]  While her statement concerning the filing of a grievance with the EEOC is certainly protected activity, her complaints about Mr. Decker's discussion with Mr. Hensley about a female associate and her discussion of the sex tape are arguably less so.  Nonetheless, in the absence of any challenge from defendant, the court concludes for purposes of the motion that these activities constitute protected activities under Title VII.  *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (noting that good-faith allegation of discrimination will support ensuing retaliation claim regardless of whether discrimination actually occurred).

Viewed in the light most favorable to plaintiff, Mr. Decker obviously had knowledge of plaintiff's comments about the sex tape and his discussion about another female employee because she testified that she raised those issues in the meeting with Mr. Decker on December 14, 2011.  But a jury could also conclude that Mr. Decker had knowledge, prior to plaintiff's termination, that plaintiff had notified defendant that she intended to file a grievance with the EEOC.  While Ms. Scott did not forward plaintiff's e-mail to Mr. Decker, Ms. Scott testified that she told Mr. Decker about the email on December 15, 2011—the day before plaintiff's termination.  Ms. Scott also testified that she "mostly" told Mr. Decker that plaintiff was "going

---

[4] Plaintiff also contends that she told Mr. Decker on December 14, 2011 that male managers and male employees were not treating her fairly based on her sex.  That allegation is not supported in the record.

[5] Defendant does complain in its reply that the additional facts in plaintiff's response "come from Karleen Hollis' own statements, and not the testimony of her supervisor, Mr. Decker."  Of course, it is entirely appropriate for plaintiff to rely on her own deposition testimony in responding to the motion where those portions of her testimony demonstrate personal knowledge of the facts.

14

to file a grievance." Mr. Decker terminated plaintiff the following day. While Mr. Decker insists that he did not know about plaintiff's intent to file a charge with the EEOC until after her termination, he testified to his belief that he terminated plaintiff on December 14, 2011—the same day as his meeting with her—when, in fact, he did not terminate plaintiff until two days later. Plaintiff, then, has come forward with evidence sufficient to establish a causal connection between her protected activity and her discharge. *Shaw,* 408 Fed. Appx. at 183 (temporal proximity enough to show causation for purposes of establishing prima facie case where termination occurred 10 days after protected activity); *Fye*, 516 F.3d at 1228 (temporal proximity of two weeks between termination and protected activity is alone sufficient to establish causal connection for purposes of prima facie case of retaliation).

Because plaintiff has established a prima facie case of retaliation, defendant must articulate a legitimate, nonretaliatory reason for its decision to terminate plaintiff's employment. According to defendant, Mr. Decker and Mr. Kassem decided to terminate plaintiff's employment based on her insubordination during the December 14, 2011 meeting with Mr. Decker and based on her job performance. Because defendant has clearly satisfied its burden, plaintiff, to survive summary judgment, must come forward with evidence sufficient to cast doubt on defendant's articulated reasons. As will be explained, the court concludes that plaintiff's evidence of temporal proximity, combined with other evidence of pretext described below, is sufficient to create a reasonable inference that defendant's reasons are unworthy of belief.

While evidence of pretext may take a variety of forms, plaintiff must produce evidence showing "weakness, implausibility, inconsistency, incoherency, or contradiction in the

15

employer's stated reasons, such that a reasonable jury could find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc.*, ___ F.3d ___, 2013 WL 6170983, at *10 (10th Cir. Nov. 26, 2013). In determining whether the proffered reason is pretextual, the court examines "the facts as they appear *to the person making the decision*, not as they appear to the plaintiff." *Id.* (emphasis in original). The court does not "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id.*

Coupled with her evidence of temporal proximity, plaintiff has some forward with evidence casting doubt on defendant's proffered reasons. Although defendant states that plaintiff's termination resulted in part from plaintiff's job performance, Mr. Decker testified that on December 14, 2011 he intended to give plaintiff a verbal warning about her job performance. A jury could reasonably conclude, then, that plaintiff's performance issues did not factor into the termination decision when those same performance issues warranted only a verbal warning as of December 14, 2011. Moreover, plaintiff has been somewhat stymied in her attempts to demonstrate satisfactory performance because her personnel file (which would contain performance evaluations and was maintained in Mr. Decker's desk drawer) has not been produced. Mr. Decker asserts that the file was stolen from the drawer and it has not been recovered. With respect to defendant's assertion that plaintiff's insubordination during the December 14, 2011 meeting played a part in her termination, plaintiff highlights that Mr. Decker did not terminate plaintiff at the end of the meeting and there is no evidence suggesting that he believed her conduct warranted termination at that time. Although Mr. Decker testified that he contacted Mr. Kassem, who then allegedly suggested that plaintiff should be terminated for

16

insubordination and performance issues, Mr. Decker could not recall any details about his conversation with Mr. Kassem and the timing of his conversation with Mr. Kassem (in relation to the information he received from Ms. Scott about plaintiff's intent to file a charge) is not clear from Mr. Decker's testimony.[6]

For the foregoing reasons, a jury trial is required on plaintiff's retaliation claim to resolve material factual disputes concerning plaintiff's termination.

## V. Whistleblowing Claim

Plaintiff contends in the pretrial order that her employment was terminated as a result of her complaints about defendant's "illegal tax practices" whereby defendant allegedly understated the value of its exported merchandise to reduce the amount of customs duties owed. The Kansas Supreme Court has recognized the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine. *See Palmer v. Brown*, 242 Kan. 893, 896 (1988). As the Court noted in *Palmer*:

> Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort.

*Id*. at 900. To establish this claim, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, that a reasonably prudent person would have concluded the employee's employer was engaged in activities in violation of rules, regulations,

---

[6] Plaintiff did not take the deposition of Mr. Kassem.

or the law pertaining to public health, safety, and the general welfare; that the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and that the employee was discharged in retaliation for making the report. *Id*.

Defendant moves for summary judgment on this claim on the grounds that no reasonable jury could conclude that either of the individuals responsible for terminating plaintiff's employment—Mr. Decker and Mr. Kassem—had knowledge of plaintiff's complaints or reports. The court agrees. Viewed in the light most favorable to plaintiff, the facts demonstrate that plaintiff, upon discovering that defendant[7] was attempting to avoid or reduce its customs tax, told Amos Vega, defendant's Customer Service Manager, that she believed that the practice was illegal. She further testified that, at some unspecified date, she filed a report with the Internal Revenue Service. She testified—and does not now controvert—that she did not tell Mr. Decker or Mr. Kassem about her concerns. She also testified that she does not know whether Mr. Vega told Mr. Decker about her complaint concerning the tax issue and she has no knowledge about whether Mr. Decker or Mr. Kassem knew about her filing with the IRS. She suspects, however, that her reporting (whether to Mr. Vega, the IRS or both) factored into her termination because one of her coworkers "told somebody outside of Acoustic Sounds that the reason why [she] was terminated was because [she] was investigating too much on the back tax, on the tax fraud" and then that individual relayed to her what plaintiff's co-worker had said.

Plaintiff's evidence is insufficient to permit a jury to find in her favor on this issue. She admits that she did not tell Mr. Decker or Mr. Kassem about her concerns and that she has no

---

[7] While plaintiff never identifies the purported "wrongdoers" in this case, the uncontroverted evidence in the record indicates that Mr. Kassem had the final decision concerning the valuation of all merchandise.

18

knowledge of whether Mr. Vega did so. Her testimony concerning her suspicions that Mr. Decker or Mr. Kassem may have known about her complaint or report is entirely speculative and, in any event, is based solely on inadmissible hearsay. Plaintiff could not even recall whether she reported her concerns to the IRS prior to her discharge. In the end, there is simply no admissible evidence from which a jury could conclude that Mr. Decker or Mr. Kassem knew about plaintiff's reporting at the time of the termination decision. Summary judgment, then, is warranted on this claim. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203-04 (10th Cir. 2008) (summary judgment appropriate on retaliation claim where plaintiff had no facts showing that anyone involved in his termination had knowledge of protected activity; uncontested evidence established that HR manager received complaint, did not share it with anyone else, and did not participate in termination decision).[8]

Defendant also contends that summary judgment is appropriate because plaintiff cannot demonstrate that her report or complaint related to an issue of "public health, safety and the general welfare." In response, plaintiff urges that she reported a violation of the law but fails to address whether those laws relate to public health, safety and the general welfare. While it appears that plaintiff may have conceded this issue, the court ultimately declines to address it because summary judgment is so clearly warranted on the issue of defendant's knowledge.

---

[8] In the absence of evidence that plaintiff reported her concerns to the IRS prior to her discharge, the court is left only with plaintiff's internal complaint to Mr. Vega, defendant's customer service representative. There is no evidence that Mr. Vega occupied a position of "higher authority" than the purported wrongdoers. *See Lykins v. CertainTeed Corp.*, ___ Fed. Appx. ___, 2014 WL 541827, at *3-4 (10th Cir. Feb. 12, 2014) (under Kansas law, protected act of whistleblowing requires plaintiff to report wrongdoing to someone "higher than the wrongdoer"). Thus, although defendant has not made the argument, the court finds that summary judgment is also appropriate on the grounds that plaintiff's internal reporting did not qualify as whistleblowing in any event.

19

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment on all claims (doc. 44) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 28th day of February, 2014, at Kansas City, Kansas.

> s/ John W. Lungstrum
> John W. Lungstrum
> United States District Judge